IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEZ HOLDING AG, SEZ AG, KURT
LANGEN, AND PHILIPP ENGESSER

               Plaintiffs and
               Counter-Defendants,

     v.

APPLIED MATERIALS, INC.,

               Defendant and
               Counterclaimant.

C.A. No. 05-552 SLR

---

## APPLIED MATERIALS, INC.'S BRIEF REGARDING CONSTRUCTION OF DISPUTED CLAIM TERMS FOR THE PATENTS-IN-SUIT

FISH & RICHARDSON P.C.
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Juanita R. Brooks
Albert R. Ubieta
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

Limin Zheng
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel: (650) 839-5070
Fax: (650) 839-5071

Attorneys for Defendant
APPLIED MATERIALS, INC.

DATED: January 4, 2007

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

       A.     Prior Art Capillary-Type Edge Bead Removal Apparatus ........................2

       B.     The Inventions of the Patents-in-Suit .......................................................4

III.   THE LAW OF CLAIM CONSTRUCTION...........................................................6

IV.    ARGUMENT ..........................................................................................................8

       A.     "Rigid Ring" ..............................................................................................8

       B.     Other Claim Terms ..................................................................................11

V.     CONCLUSION......................................................................................................13

### TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
    796 F.2d 443 (Fed. Cir. 1986)..........................................................................8, 9

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
    249 F.3d 1341 (Fed. Cir. 2001)...............................................................................11

*Kinik Co. v. Int'l Trade Comm'n*,
    362 F.3d 1359 (Fed. Cir. 2004)............................................................................7, 9

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).......................................6

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005)............................................................................7, 8

*Mentor H/S, Inc. v. Medical Device Alliance*,
    244 F.3d 1365 (Fed. Cir. 2001)...............................................................................11

*Metabolite Labs, Inc. v. Lab Corp. of Am. Holdings*,
    370 F.3d 1354 (Fed. Cir. 2004)................................................................................7

*Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992)................................................................................9

*Multiform Desiccants v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998)............................................................................8, 9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................6, 7, 8, 11

*Trovan, Ltd. v. Sokymat SA*,
    299 F.3d 1292 (Fed. Cir. 2002)................................................................................1

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)...............................................................................12

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)................................................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................................6

Defendant Applied Materials, Inc. ("Applied") respectfully submits this brief in support of its proposed claim interpretations set forth in the Claim Construction Statement submitted with the parties' proposed pretrial order as PTO Exhibit 2.[1]

## I.    INTRODUCTION

This is an inventorship dispute.  Applied is the assignee of duly issued United States Patent Nos. 6,708,701 ("the '701 patent") and 6,786,996 ("the '996 patent"), which relate to the substrate etching and cleaning process in semiconductor device fabrication. (Halkowski Decl., Exs. A and B).[2]  Plaintiffs SEZ Holding AG, SEZ AG, Kurt Langen ("Langen"), and Philipp Engesser ("Engesser") (collectively, "SEZ") allege that Langen and Engesser are the true inventors of the inventions claimed in the patents-in-suit.  "[A]n inventorship analysis, like an infringement or invalidity analysis, begins as a first step with a construction of each asserted claim to determine the subject matter encompassed thereby." *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citation omitted).

In this case, the primary claim construction dispute concerns the term "rigid ring" and related phrases.  SEZ argues that "rigid ring" should be construed to mean an "inflexible ring."  However, to simply replace the term "rigid" with the word "inflexible" does nothing to help define the scope of the claimed inventions.  Conversely, Applied's proposed construction results from reading the claims in light of the patent's specification which clearly sets a floor for the minimum rigidity required for the ring at issue.  The specification for both of the patents-in-suit explains that the ring is to be made of a material and/or have a structure that allows the ring to be sufficiently rigid such that the ring does not deform during and immediately after the mounting process and does not

---

[1]    The Claim Construction Statement is being filed concurrently today as Exhibit 2 to the parties' proposed pretrial order.  A copy is also attached at the end of this brief for the convenience of the Court.

[2]    "Halkowski Decl." refers to the Declaration of Thomas L. Halkowski in Support of Applied Materials, Inc.'s Brief Regarding Construction of Disputed Claim Terms for the Patents-in-Suit.

thereby cause varied processing results.  Applied, therefore, requests that the term "rigid ring" and related phrases be interpreted to mean "a ring whose material and/or structure allows the ring to be sufficiently inflexible such that it does not deform during and immediately after the mounting process and cause varied processing results."

## II.    BACKGROUND

### A.    Prior Art Capillary-Type Edge Bead Removal Apparatus

In semiconductor device fabrication, multiple coating/growing processes (also known as "deposition") are conducted to generate a multilayer pattern of conductive, semiconductive, and/or insulating materials on a substrate to create micro-electronic circuits.  One of the available deposition technologies is called electrochemical deposition (ECD).  When an ECD process is used, metal ions in the electrolyte solution are, inadvertently, deposited on the edge and backside portions of the substrate.  The unwanted deposits on the edge and backside of the substrate can lead to problems, *e.g.*, interfering with the planarization process (a step generally used to polish the substrate surface between the individual layer deposition steps in order to provide a flat surface for the next deposition step), and flaking off and contaminating the system with unwanted particles.  Therefore, it is important to remove these unwanted deposits from the edge and the backside of a substrate.

A backside cleaning and edge bead removal (EBR) process is generally conducted after an ECD process.  During this cleaning process, it is important to protect the front side ("face") of the substrate where the microcircuits are constructed.  One of the methods for cleaning the backside and the edge of the substrate is to place the substrate face-down on a substrate support, with the backside of the substrate facing nozzles that dispense cleaning chemicals.

United States Patent No. 4,903,717 ("the '717 patent"), entitled "Support for Slice-Shaped Articles and Device for Etching Silicon Wafers with Such a Support" and issued on February 27, 1990, describes an EBR tool that holds the substrate face-down

according to Bernoulli's principle.[3] (Halkowski Decl., Ex. C.)  The substrate support described in the '717 patent includes an annular nozzle in the surface of the support facing the substrate.  The compressed gas coming out of the annular nozzle provides a gas cushion between the support and the substrate, which holds the substrate according to the Bernoulli principle, and prevents the passage of treatment fluid onto the front-side of the substrate facing the support.

Various improvements on the EBR tool detailed in the '717 patent have been described.  For example, U.S. Patent No. 5,896,877, entitled "Support for Wafer-Like Objects" and issued on April 27, 1999, describes an annular "step 10," which allows treatment liquid to flow around the circumferential edge of a substrate resting on the gas cushion onto the limited and defined areas of the face of the substrate.  (Halkowski Decl., Ex. D, at 2:32-51 & Fig. 3.)  This allows the cleaning or etching of not only the backside of the substrate but also the beveled edge of the substrate and a portion of the face that is very close to the edge.

European Patent Application No. 99108319.7 (translation attached as Ex. E to Halkowski Decl.), published November 15, 2000 (Publication No. EP 1052682A1, corresponding U.S. Patent Application Publication No. 2004/0020427 A1 attached as Ex. F to Halkowski Decl.), names Langen as the sole inventor.  The Langen application describes a further improved EBR tool that incorporates a Bernoulli chuck.  In addition to the conventional Bernoulli chuck described in the '717 patent, the system described in EP 99108319.7 includes a "gas guide device" on the periphery of the chuck to further aid in treating a defined edge area on the front side of the substrate facing the chuck.  (*Id.* at 2:29-33; 3:33-35.)  In one embodiment, the gas guide device has the shape of a ring.  (*Id.*

---

[3]   Bernoulli's principle states that in fluid flow (*i.e.*, liquid or gas), an increase in velocity occurs simultaneously with decrease in pressure.  In a Bernoulli chuck, a flow of air forms a gas cushion between the substrate and the substrate support.  The substrate is thus held suspended above the substrate support by the Bernoulli effect due to the reduced air pressure in the space resulting from the increased velocity of the air being blown into the space.

3

at 4:27-30.)  The narrow gap between the gas guide device and the substrate creates a capillary force, through which the treatment fluid that flows around the peripheral edge of the substrate can be captured by the gas guide device and drawn into the gap to etch a defined area of the surface of the substrate facing the chuck.  (*Id.* at 4:32-34; 5:27-29.)  The ring-shaped gas guide device is known as the "capillary ring."

### B.    The Inventions of the Patents-in-Suit

The inventions described in the '701 and '996 patents are closely related and focus upon certain improvements over conventional capillary-type EBR systems.  The improvements described in the '701 and '996 patents primarily include the use of a rigid capillary ring that is configured to maintain a substantially planar capillary surface when attached to the mounting posts, and the use of extendable support pins located proximate to the capillary ring to provide initial support for the substrate.

As explained in the patents-in-suit, one of the disadvantages of the conventional capillary-type EBR system disclosed in the prior art is that the capillary ring can be bent and deformed due to various torques exerted on the ring from the mounting process.  This deformation can cause an unacceptable varying of process results when the ring is first installed or whenever it is replaced during various types of operations.  (*See, e.g.,* Ex. A at 3:1-6; Ex. B at 3:4-14.)  The inventions described in the patents-in-suit solve this problem by employing a capillary ring made with appropriate structure and/or materials such that the ring is rigid enough to not deform during and immediately after the mounting process.  (*See, e.g.*, Ex. A at 8:52-62.)  The rigidity of the ring described in the patents allows the substrate support assembly (including the capillary ring) to be disassembled and reassembled for processing without encountering varied processing results due to deformation of the ring.  (*Id.* at 8:60-66.)

The improvement concerning the rigidity of the capillary ring is expressly claimed in the '701 and '996 patents and is a key aspect of the inventions.  Each and every claim of the '701 patent requires a rigid ring.  (*See* Ex. A at 11:36-14:8.)

4

Specifically, claim 1 and dependent claims 2-10 of the '701 patent are directed to an EBR apparatus having a "rigid annular capillary ring" with "a substantially planar capillary surface." (*Id.* at 11:36-12:7.)  Claim 11 and dependent claims 12-20 of the '701 patent are directed to a capillary ring for a capillary-type EBR system where the body portion of the capillary ring has "a substantially planar-capillary surface formed on an upper surface of the body portion" and is "manufactured from a rigid material." (*Id.* at 12:8-43.) Claims 21-32 of the '701 patent are directed to a substrate support for EBR process, and each requires a "rigid ring." (*Id.* at 12:44-14:8.)  Similarly, claim 1 and dependent claims 2-11 of the '996 patent are directed to an EBR apparatus having an annular capillary ring that is  "rigidly mounted to the capillary ring support posts," and has "a planar upper surface."

Another problem associated with the conventional capillary-type EBR systems is staining.  As discussed in the patents-in-suit, a substrate may have copper sulfate liquid residue on its production surface from previous metal layer deposition steps.  When the substrate with the liquid residue is placed face-down on a Bernoulli chuck, the gas cushion dries the copper sulfate residue, which causes unwanted staining on the production surface of the substrate. (*See, e.g.*, Ex. B at 2:54-60.)  To solve the staining problem, the '701 and '996 patents teach a method and apparatus for preparing the substrate for the EBR process.  In the system described in the patents, the substrate carrying liquid residues from the previous deposition steps is first loaded onto extendable support pins located very close to, or extending directly through, the capillary ring.  Once the substrate is placed on the support pins (which have been extended above the capillary ring to engage the substrate), gripper assemblies positioned around the perimeter of the upper substrate support surface close to secure and center the substrate.  Once the substrate is secured and centered, the support pins are retracted and the substrate is supported just by the grippers. (*See, e.g., id.* at 10:6-27.)  A rinsing solution (such as deionized water) containing agents that prevent corrosion is then applied to the

production surface of the substrate.  (*Id.* at 10:27-42.)  Thereafter, the surface of the substrate is dried through application of nitrogen gas and isopropyl alcohol, which remove any residue moisture from the surface of the substrate, and is ready for the subsequent EBR process.  (*Id.* at 11:3-6.)  To avoid damage to the production surface, the patents teach that the support pins are generally positioned proximate to the capillary ring so that the support pins may engage a substrate at the edge or exclusion region of the substrate.  (*See, e.g., id.* at 9:60-67.)

The improvement concerning the extendable support pins located proximate to the capillary ring is expressly claimed in the '701 and '996 patents.  Each and every claim of the '996 patent recites a plurality of support pin assemblies positioned proximate the annular capillary ring along the perimeter of the substrate support.  (*See id.* at 12:8-14:37.)  Also, Claims 10, 20, and 21 (and dependent claims 22-32) of the '701 patent require an extendable support pin that can extend directly through the capillary ring.  (*See* the '701 patent, at 12:3-7; 12:38-14:8.)

## III.    THE LAW OF CLAIM CONSTRUCTION

The construction of disputed claim terms focuses primarily on the intrinsic evidence, which includes the claims, the specification, and the prosecution history of the patent.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  "[W]hile extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (citations and internal quotation marks omitted).

Words of a claim "are generally given their ordinary and customary meaning" as would have been understood by a person of ordinary skill in the art at the time of the invention.  *Id.* at 1312-13.  The "ordinary and customary meaning" of a claim term is not simply any dictionary meaning, but is the "meaning to the ordinary artisan ***after reading***

*the entire patent*." *Id.* at 1321 (emphasis added); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (noting that intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").

The claims themselves provide substantial guidance and are valuable sources of enlightenment as to the meaning of a particular claim term. *Phillips*, 415 F.3d at 1314. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582); *see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history.") (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.")). This is because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313 (citing *Multiform Desiccants*, 133 F.3d at 1477).

The inventor's description in the specification, including the purpose of the invention and the disadvantages of the prior art, provides an aid to assist in defining the scope of the claimed invention. *Kinik*, 362 F.3d at 1365 ("The inventor's discussion of

7

the disadvantages of the . . . prior art sheds light on the scope of the invention."); *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed. Cir. 1986) (holding that "smooth" meant "smooth enough to serve the inventor's purposes" described in the specification). The prosecution history should also be consulted in construing the meaning of a claim term. *Phillips*, 415 F.3d at 1317. "The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." *Id.* (quoting *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotation marks omitted).

## IV. ARGUMENT

### A.    "Rigid Ring"[4]

SEZ asks the Court to interpret the claims in a vacuum and simply replace the term "rigid" with "inflexible." However, the mere swapping of words proposed by SEZ does nothing to help define the scope of the inventions and is not supported by any of the intrinsic evidence. For the reasons discussed below, Applied submits that a person of ordinary skill in the art *reading the entirety of the patents* would understand that the requisite rigidity of the claimed capillary ring requires at a material and/or structure that allows the ring to be sufficiently inflexible such that it does not deform during and immediately after the mounting process and thereby cause varied processing results.

"Claims are not interpreted in a vacuum, but are part of and are read in light of the specification." *Multiform Desiccants*, 133 F.3d at 1477 (quoting *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987)); *see also Medrad*, 401 F.3d at 1319. "The inventor's discussion of the disadvantages of the . . . prior art sheds light

---

[4]    As detailed in the Claim Construction Statement attached to this brief, the term "rigid ring" and related terms appear in multiple claims of the '701 and '996 patents. Claims 1-10 of the '701 patent recite a "rigid annular capillary ring"; claim 11-20 of the '701 patent require a ring with a "substantially planar-capillary surface formed on an upper surface of the body portion, the body portion being manufactured from a rigid material"; claims 21-32 of the '701 patent recite a "rigid ring". Similarly, claims 1-11 of the '996 patent recite "an annular capillary ring rigidly mounted to the capillary ring support posts, the capillary ring having a planar upper surface[.]"

on the scope of the invention." *Kinik*, 362 F.3d at 1365. Moreover, the purposes of the invention described in the specification give meaning to the claim terms. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed. Cir. 1986).

In *Bausch & Lomb*, the Federal Circuit interpreted the claim term "smooth," and held that "smooth means smooth enough to serve the inventor's purposes" described in the specification. *Id.* Likewise, in *Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565-67 (Fed. Cir. 1992), relying on the specification's description of the fundamental purpose and significance of the invention and the use of the invention in overcoming the problems experienced in the prior art, the court interpreted the claim terms "lubricant" and "pre-lubricated" to require that the lubricated surface be "slippery." In *Multiform Desiccants*, the court held that the meaning of the term "degradable" was limited to the dissolution/degradation of the envelope "as described in the specification." *Multiform Desiccants*, 133 F.3d at 1477-78.

In this case, the claimed "rigid ring" improvement is not just an abstract requirement. Rather, the term concerns a solution to a specific problem in prior art EBR systems and thereby requires that a ring be rigid enough to achieve that purpose. In other words, the claim term "rigid ring" means a ring rigid enough to serve the inventor's purpose and overcome the disadvantages of the prior art capillary-type EBR systems described in the specifications. *See Kinik*, 362 F.3d at 1365; *Minnesota Min.*, 976 F.2d at 1565-67; *Bausch & Lomb*, 796 F.2d at 450.

As explained in the Background of Invention section of both patents, the rigid ring improvement described and claimed in the patents was to overcome a particular disadvantage of prior art capillary-type EBR systems:

> Another disadvantage of the capillary-type EBR system is that the geometry of the plastic capillary ring has a substantial effect upon the EBR effectiveness. For example, if the plastic capillary ring is not completely planar, then the EBR process will be uneven around the perimeter of the substrate. This poses a significant disadvantage, as the plastic capillary ring is a common component that is removed during

9

> various types of system maintenance, and when the ring is reinstalled,
> often the surface is not planar as a result of various torques exerted on the
> plastic ring from the mounting hardware.

(Ex. A at 2:63-3:6; and Ex. B at 3:4-14.)  Thus, "there exists a need for a capillary EBR system capable of being easily dismantled and reassembled for substrate production, where the capillary ring of the EBR system is configured to maintain a desired geometry upon reassembly."  (Ex. A at 3:7-11)

One critical aspect of inventions described and claimed in the '701 and 996 patents, therefore, is to employ a capillary ring whose material and/or structure allows the ring to be sufficiently inflexible such that it does not deform during and immediately after the mounting process and thereby avoid having varied processing results due to the unevenness of the capillary surface.  (Ex. A at 8:60-66 ("The ***material and structure*** of ring 210 is generally calculated to be ***sufficiently rigid as to not deform during and immediately after the mounting process***.  Therefore, the rigidity of ring 210 allows the support member of the invention to be disassembled and reassembled for processing ***without encountering varied processing results generated from deflection of ring*** 210 in the installation process.") (emphasis added); and Ex. B at 9:32-38 (same); *see also* Ex. A at Abstract ("The rigid annular capillary ring includes a substantially planar upper capillary surface and is configured to maintain the substantially planar capillary surface when attached to the mounting posts."); at 3:19-22 ("The rigid annular capillary ring includes a substantially planar capillary surface and is configured to maintain the substantially planar capillary surface when attached to the mounting posts."); at 3:26-29 ("[T]he capillary ring being manufactured from a rigid material configured to maintain the substantially planar capillary surface when installed in the edge bead removal system.").)  The patents further teach that the capillary ring may be manufactured from a rigid material such as, for example, "aluminum, stainless steel, titanium, carbon steel, nickel, or hard plastic compound, such as nylon and Teflon compounds[.]"  (Ex. A at 8:52-56; and Ex. B at 9:24-28.)  The patents also teach that the mounting posts

structurally supporting the capillary ring may be "cylindrical posts rigidly affixed to the upper surface 229 of substrate support member 201."  (Ex. A at 8:67-9:2; and Ex. B at 9:39-41.)

Therefore, when read in the context of the patents' specifications, "rigid ring" and related terms mean "a ring whose material and/or structure allows the ring to be sufficiently inflexible such that it does not deform during and immediately after the mounting process and cause varied processing results."[5]

### B.    Other Claim Terms

SEZ seeks construction of two other additional terms: (i) "support pin(s)" and related phrases; and (ii) "proximate."[6]  Construction of these terms, however, is not necessary.  *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (holding that district court did not err in declining to construe "melting" when the meaning of "melting" did not depart from its ordinary meaning or otherwise appear to have required construction); *Mentor H/S, Inc. v. Medical Device Alliance*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (holding that district court did not err in refusing to construe the claim terms "irrigating" and "frictional heat" and relying on the ordinary meanings of these terms); *see also Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly

---

[5]    The specific terms at issue concerning the "rigid ring" limitation are set forth in the Claim Construction Statement attached hereto at Tab 1.

[6]    The terms related to "support pins" are: "a longitudinally extendable substrate support pin," "support pins selectively extendable from the rigid ring in order to raise the wafer above the ring," "selectively extendable substrate support pin assemblies," "a longitudinally extending substrate support pin," and "a plurality of selectively actuated pin assemblies" (claims 10 and 21 of the '701 patent, and claims 1, 4, and 12 of the '996 patent, respectively).  In addition, although not sought to be construed by SEZ, claim 20 of the '701 patent also requires "substrate support pin bores" formed in the capillary ring and "being configured to communicate a longitudinally extendable substrate support pin therethrough from below the capillary ring."  The term "proximate" appears in claims 1 and 18 of the '996 patent.

understood words."); *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). SEZ's proposed definitions fail to add clarity to the scope of the claims, and worse, inject vagueness and inaccuracy into the plain and ordinary meaning of these terms.

With respect to "support pins" and related phrases (claims 10 and 21 of the '701 patent, and claims 1, 4 and 12 of the '996 patent, respectively), SEZ proposes the following construction: "pins that are positioned to contact a wafer and are axially extensible and retractable relative to the apparatus." SEZ's definitions suffer from multiple problems. For example, SEZ narrows the term "substrate" in claim 10 of the '701 patent and claims 1, 4 and 12 of the '996 patent to "wafer" without any basis. Second, SEZ's definition introduces an undefined term "apparatus" and the limitation "relative to the apparatus." Third, with respect to claims 1 and 12 of the '996 patent, SEZ's definition equates substrate support pin "assemblies" with "pins" with no apparent basis. Indeed, claim 4 of the '996 patent, which is a dependent claim of claim 1, makes clear that the "substrate support pin assemblies" of claim 1 "comprise," among other things, "a longitudinally extending substrate support pin having a distal substrate support surface formed thereon." (*See* Ex. B at 12:43-49.) Similarly, dependent claim 13 of the '996 patent makes clear that the "pin assemblies" of claim 12 "comprise . . . an elongated substrate support pin[.]" (*Id.* at 13:34-39.)

Thus, if the Court were inclined to further define the term "support pins" and related terms they should simply be defined to mean "pins to provide support for the substrate." See Claim Construction Statement (attached hereto) (detailing Applied's responsive proposed interpretations for the "support pins" and related terms).

Like the "support pins" term, SEZ's proposed construction of "proximate" to mean "at or near" fails to add any clarity to the claim term, and serves only to generate uncertainty. For example, SEZ's proposed definition of the support pins being "at" the

annular capillary ring does not clearly reflect the scope of independent claim 1 of the '996 patent as including support pins that extend directly through the capillary ring. Specifically, claim 1 broadly recites "substrate support pin assemblies positioned *proximate* the annular capillary ring on the substrate support member." (*See id.* at 12:9-29.) Dependent claim 7 further requires that the substrate support pin, which is part of the pin assemblies of claims 1 and 4, be "configured to extend through a bore formed in the annular capillary ring." (*Id.* at 12:56-58.) However, to the extent any additional interpretation is provided, the term "proximate" should be simply be defined as "very close to or within."

## V.    CONCLUSION

For the foregoing reasons, Applied respectfully requests that the Court adopt Applied's proposed interpretations for the disputed claim terms as set forth in the attached Claim Construction Statement.[7]

---

[7]    SEZ has complained that the Court should simply ignore all of Applied's proposed claim constructions, because they were not sent to SEZ on October 20th. Applied had understood that the parties' approach would be to first exchange identification of terms requiring construction, then meet and confer to discuss the parties' positions regarding claim construction to determine what terms actually needed to be presented to the Court in the parties' joint claim construction statement. *See* Halkowski Decl., Ex. G. When SEZ first objected on November 9, 2006, to not having received Applied's proposed claim constructions, Applied acknowledged its misunderstanding of the approach the parties' were to take (*id.*) and sent an e-mail on November 10, 2006, (*Id.*, at Ex. H) that:

(i)    provided Applied's proposed constructions regarding "rigid ring" and related phrases;

(ii)    advised SEZ that it was Applied's position that the terms "support pins" and "proximate" and related phrases did not require construction by the Court, but that the parties should meet and confer attempt to resolve this issue; and

(iii)    requested that the parties meet and confer to arrive at the joint claim construction statement for submission to the Court.

In an effort to meet and confer, Applied followed-up its November 10, 2006 e-mail with multiple phone calls and e-mails, but SEZ has refused to engage Applied on the merits. Instead, SEZ has argued that Applied has waived its right to any claim

Dated:  January 4, 2007                          FISH & RICHARDSON P.C.

                                                 /s/ *Thomas L. Halkowski*
                                                 Thomas L. Halkowski (#4099)
                                                 919 N. Market Street, Suite 1100
                                                 P.O. Box 1114
                                                 Wilmington, DE  19899-1114
                                                 Tel:  (302) 652-5070
                                                 Fax:  (302) 652-0607

                                                 Juanita R. Brooks
                                                 Albert R. Ubieta
                                                 12390 El Camino Real
                                                 San Diego, CA 92130
                                                 Tel:  (858) 678-5070
                                                 Fax: (858) 678-5099

                                                 Limin Zheng
                                                 500 Arguello Street, Suite 500
                                                 Redwood City, CA  94063
                                                 Tel:  (650) 839-5070
                                                 Fax:  (650) 839-5071

                                                 Attorneys for Defendant
                                                 APPLIED MATERIALS, INC.

---

construction.  By December 29, 2006, when it became clear that SEZ would not meet
and confer regarding whether it was actually necessary for the Court to construe the
"support pin" and "proximate" terms and related limitations, Applied forwarded
proposed constructions for these terms in response to SEZ's proposed constructions.
As noted above, however, Applied continues to believe that construction of those
terms is not necessary.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 4, 2007, I electronically filed the attached

**APPLIED MATERIALS, INC.'S  BRIEF  REGARDING CONSTRUCTION OF**

**DISPUTED CLAIM TERMS FOR THE  PATENTS-IN-SUIT** with the Clerk of

Court using CM/ECF which will send electronic notification of such filing(s) to the

following Delaware counsel.  In addition, the filing will also be sent via hand delivery:

Josy W. Ingersoll                                   *Attorneys for Plaintiffs*
John W. Shaw                                       *SEZ AG, Kurt Langen and*
Andrew A. Lundgren                             *Phillipp Engesser*
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE  19899-0391


I hereby certify that on January 4, 2007, I served the document(s) on the

following via e-mail and first class mail:

Douglas V. Rigler                                  *Attorneys for Plaintiffs*
Andrew J. Patch                                    *SEZ AG, Kurt Langen and*
Young & Thompson                              *Phillipp Engesser*
745 South 23rd Street
Arlington, VA 22202


                                                            */s/ Thomas L. Halkowski*
                                                            Thomas L. Halkowski